UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DUJUAN O'NEAL,

      Petitioner,

v.

JEFFREY WOODS,

      Respondent.

_____/

Case No. 10-CV-12836

HONORABLE LAWRENCE P. ZATKOFF

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY

This is a habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. §2254. Petitioner DuJuan O'Neal is serving a controlling term of three concurrent sentences of life imprisonment for his felony-murder convictions in the deaths of Christopher Kasshamoun, Rany Sharak and Wesam Akrawi, who were killed in the City of Detroit in November 2002. Petitioner asserts that his convictions are unconstitutional because he received ineffective assistance of counsel at trial and because the prosecutor violated his due process rights by suppressing exculpatory evidence. For the reasons stated below, the Court denies the petition.

I.    FACTS

The facts established at trial are outlined in the opinion of the Michigan Court of Appeals, which are presumed correct on habeas review. 28 U.S.C. §2254(e).

> This case arose from the November 2002 shooting deaths and ensuing dismemberments of Christopher Kasshamoun, Rany Sharak and Wesam Akrawi in the City of Detroit. The victims were discovered in a two-unit residential complex at 2315 Vermont in the City of Detroit where Jamale Stewart and his girlfriend, Tuwana Chambers, resided. The victims regularly sold Jamale large amounts of marijuana, which Jamale trafficked. Jamale knew defendant as Jason, who had a long-time intimate relationship with Jamale's mother, Felicia Stewart, which ended in 1997 or 1998. Defendant lived in Spring Valley, New York, and would visit Detroit three to five times a year. Around November 15, 2002, defendant traveled to Detroit.

On November 18, 2002, Jamale arranged for the victims to deliver 35 pounds of marijuana to his home the next evening. Jamale intended to pay Sharak $29,000 for past debt and receive additional marijuana to sell. Before the sale, defendant stopped by Jamale's house, and he, Jamale, and one of Jamale's friends went to a car dealership where Jamale test-drove a red Ford Explorer. While test-driving the vehicle, Kasshamoun called and told him he was waiting at Jamale's home. Jamale did not return the vehicle to the dealership, instead opting to meet Kasshamoun.

Inside the home, Kasshamoun gave Jamale marijuana that was wrapped in a garbage bag and Jamale gave Sharak $29,000 cash. As the money was being counted, Jamale left the room to go upstairs and retrieve his own more potent marijuana to smoke with Sharak. Defendant, who had been seated in an adjacent room, followed him upstairs. Once upstairs, defendant stated to Jamale, "Let me lick these niggas." (Jamale indicated that lick means rob). Jamale responded, "No, these are my people." Defendant replied, "I'm your people."

Jamale returned to his seat and continued talking with Sharak. Defendant also returned to his seat in the adjacent room. Jamale had earlier testified that at his home were two .357 revolvers, and that defendant had seen them before and knew their location. Defendant stood up and grabbed a gun lying on a credenza and ordered the men to "get down." Sharak refused, stating, "I'm not getting down man, you can take this shit and you can leave," and defendant grabbed Sharak by the shirt and hit him in the side of the head with the gun. Defendant then forced Sharak by gunpoint to the top of basement steps. Jamale heard a gunshot, saw a flash and heard Sharak fall down the basement steps.

Defendant returned to the living room where Kasshamoun and Akrawi were lying on the ground. Akrawi made a movement and defendant shot him in the head. Kasshamoun began to cry and defendant lifted him to his feet, forced him at gunpoint downstairs where Jamale heard a gunshot. Jamale heard Akrawi make a gurgling sound and saw defendant place a plastic bag over Akrawi's head. Jamale was scared defendant would kill him and helped defendant carry Akrawi to the basement.

Jamale testified that defendant left and returned after 30 to 45 minutes with Home Depot shopping bags containing an electric chainsaw, Shop-Vac, garbage bags and gloves. After defendant returned, Jamale began to clean Akrawi's blood from the living room and defendant began to dismember Kasshamoun's body using the chainsaw. Jamale watched defendant cut off Kasshamoun's arms, but "couldn't take it," and went upstairs. Around this time, Jamale's brother, Ramone, stopped by Jamale's home. Jamale told Ramone to leave but he would not, and defendant, who had come upstairs, asked Ramone to come in, which he did. Jamale explained what had happened to Ramone, who then went to the basement to help defendant. Jamale eventually returned to the basement and saw Kasshamoun's body dismembered. Defendant told him to take the victims' clothes, marijuana and a pistol from the house. He placed the items into garbage bags, which he loaded into the Explorer. Jamale testified that he called a taxi driver friend to follow him.

2

Chambers arrived at Jamale's house around that time. She saw Jamale, Ramone and defendant, who she described as having "funny color" eyes. She helped clean and later got into the taxi, which followed Jamale in the Explorer until police stopped him. Jamale fled the Explorer on foot and the taxi continued past Jamale and returned to the house. Detroit Police Officer John Furmanski and his partner made the traffic stop and Furmanski identified Jamale in subsequent lineup. He testified that a search of the Explorer revealed a large amount of marijuana, and a semi-automatic Mack 11 nine-millimeter firearm. Detroit Police Officer Thomas Smith of the Evidence Technicians Unit testified that he processed five garbage bags found in the cargo area of the Explorer. He testified that bags contained 51 items, including bloody clothing, pagers, cell phones, money and identifications of Kasshamoun, Akrawi and Sharak.

The taxi driver dropped Chambers at the Vermont house and later returned with Jamale. When Jamale returned home, defendant, Ramone and Chambers were sitting in the living room. Jamale, defendant, Ramone and Chambers left the house and checked into a hotel off Telegraph Road. Jamale testified that defendant told him he would burn down the Vermont house. He testified that defendant had the $29,000 in his hands at the hotel room. Felicia, testified that she confronted defendant about the money, and defendant replied, "it wasn't supposed to happen like that, he couldn't let all his money get away from him." Felicia also testified that defendant replied, "he couldn't let the money get away. It was about the money, but his intentions really wasn't to kill those people, but it was too much money." Defendant left the hotel, and about six or seven hours later, Jamale saw his house on fire on television. Jamale went to his Aunt's house, and then left for New York. Chambers testified that after the fire she went to Virginia with Felicia and Ericka Cancer. Jamale later returned to Detroit because he did not want to get arrested in New York.

Detroit police officer Michael Parish testified that on November 20, 2002, at around 3:45 a.m., he notified dispatch that the Vermont house was engulfed in flames. Detroit Fire Department fire investigator Dennis Felder testified that investigation revealed the fire at the Vermont house had been intentionally lit with an accelerant. In October 2003 Jamale entered into a plea deal with the Wayne County Prosecutor. The deal required his truthful testimony in the instant case, and, in exchange, he would plead guilty to accessory after the fact and disinterment and a six to ten year' imprisonment sentencing agreement. Also as part of the deal, he pleaded guilty to felony-firearm and served two years' imprisonment consecutive to the previous sentence.

Defendant was arrested in New York and brought to Michigan. On February 9, 2004, Detroit Police Officer Manuel Gutierrez met with defendant. Gutierrez testified that he informed defendant of his Miranda rights. He testified that he asked defendant questions and wrote down defendant's answers. Gutierrez testified to the following questions and answers:

> Q. Do you recall the incident that occurred on November 19, 2002, involving the murder of three men at 2310 Vermont Street?

> A. Yes, I do.

3

Q. Did you visit the dealership on that day?

A. Yes, I did. I was there with Jamale Stewart, we were looking at cars. Cars are cheaper here than in New York, so I was checking out a Cadillac. I would have bought it but there was something wrong with it.

Q. What happened next?

A. I hadn't been home in a while, so I visited my family. I went to see my brother and I shot craps with him.... I got a call from Jamale Stewart, telling me he wanted me to pick up some things from Home Depot. I didn't think nothing of it cause his family owns property.

Q. How did you get to your brother's house?

A. In the red Explorer. I asked Jamale if he could find someone else, but he said he left his car at the dealership. So, I went to the Home Depot and bought the Shop Vac and chain saw.

I was flirting with the lady at the register and everything. Does that seem like something someone would do after they just killed three people?

Q. What happened next?

A. I drove over to Jamale's moma's [sic] house on Glendale and gave the truck back to Jamale and Ramone Johnson.

Q. What about the items you purchased at the Home Depot?

A. I gave it to them, also.

On cross-examination, Gutierrez testified that defendant indicated he would not sign any statement, and indeed refused to sign the above statement.

Keisha O'Neal, defendant's wife, testified on his behalf. She testified that, in 2002, she and defendant lived together in Spring Valley, New York. She testified that, in November, she and defendant discussed him taking a trip to Michigan to purchase a vehicle. She did not recall the exact date defendant left, but remembered that he was gone three days. She testified that defendant sports a "Jason" tattoo on his right arm.

*People v. O'Neal*, No. 257333, 2008 WL 3851219, *1-3  (Mich. App. Aug. 19, 2008) (footnote

omitted).

4

## II. PROCEDURAL HISTORY

Petitioner filed an appeal with the Michigan Court of Appeals asserting the following three claims:

I.   The trial court abused its discretion in denying adjournments

II.  Ineffective assistance of trial counsel

III.   The trial court abused its discretion in denying new trial.

Petitioner subsequently filed a motion to remand the case to the trial court for an evidentiary hearing on whether trial counsel was ineffective for failing to call alibi witnesses Craig O'Neal and Keith Hale.  The Michigan Court of Appeals granted Petitioner's motion for remand.  *People v. O'Neal*, No. 257333 (Mich. App. Sept. 21, 2005).  The order of the Court of Appeals remanded the case to the trial court for an evidentiary hearing and decision whether Petitioner was denied the effective assistance of counsel for failing to call the alibi witnesses.  *Id.*  The Court of Appeals retained jurisdiction.  *Id.*

The State Appellate Defender's office was appointed as Petitioner's third appointed appellate counsel.  Through this counsel, Petitioner filed a motion to expand without limit the grounds of the evidentiary hearing.  Petitioner's motion was granted, but limited to the issues raised in Petitioner's initial appellate brief filed by his second appointed appellate counsel.  *People v. O'Neal*, No. 257333 (Mich. App. Apr. 11, 2006).  The Court of Appeals thereafter granted Petitioner's motions to expand the scope of the evidentiary hearing to include newly disclosed discovery materials, to seal the parties' supplemental briefs, to close the evidentiary hearing to the public, and to seal the resulting transcripts.  *People v. O'Neal*, No. 257333 (Mich. App. July 19, 2006).

The case was remanded to Judge Cynthia Gray Hathaway, because the original trial judge, Leonard Townsend, had retired since the original trial.  The trial court conducted a four day evidentiary hearing over the course of several months. On March 9, 2007, the trial court issued an

order granting a new trial for the reasons stated on the record. *People v. O'Neal*, No. 04-2337-01 (Wayne Co. Cir. Ct. Mar. 9, 2007) (trial court order). On April 27, 2007, the trial court issued orders denying the state's motion for reconsideration, but granting the state's motion for a stay pending appeal. *People v. O'Neal*, No. 04-2337-01 (Wayne Co. Cir. Ct. Apr. 27, 2007).

On May 10, 2007, Petitioner moved to dismiss his appeal, arguing that the trial court's grant of a new trial mooted the original appeal. On June 7, 2007, the Michigan Court of Appeals denied Petitioner's motion to dismiss his appeal and vacated the trial court's order of an new trial because the order granting a new trial exceeded the scope of the Michigan Court of Appeals' remand order. *People v. O'Neal*, No. 257333 (Mich. App. June 7, 2007).

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences in an unpublished opinion, over the dissent of Judge White. *People v. O'Neal*, No 257333 (Mich. App. Aug. 19, 2008). The Court thereafter denied reconsideration. *People v. O'Neal*, No. 257333 (Mich. App. Oct, 8, 2008). The Michigan Supreme Court denied leave to appeal in a form order, with two justices stating that they would grant leave to appeal. *People v. O'Neal*, No. 137796 (Mich. Apr. 22, 2009).

III.   STANDARD OF REVIEW

28 U.S.C. §2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the

state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

IV.   ANALYSIS

A.  Ineffective Assistance of Counsel

Petitioner asserts in his first habeas claim that he was denied the effective assistance of counsel when his trial counsel made a number of errors during his trial. He asserts that trial counsel was ineffective by failing to properly utilize the federal DEA report provided on the third day of trial, by failing to request and utilize letters written from Jamale and Felicia Stewart to Ramone Johnson in jail, by failing to call alibi witness Keith Hale, by failing to request, investigate, and utilize ballistic evidence, by failing to adequately impeach Latoya Bell, the Home Depot clerk, by failing to impeach Felicia Stewart with a prior statement, and by asking a prosecution witness a question that elicited Petitioner's nickname of "Friday the 13th." Petitioner also asserts that the cumulative effect of these errors deprived him of his right to the effective assistance of counsel.

A claim that a petitioner was denied effective assistance of counsel is evaluated by the standard set forth by the United States Supreme Court in *Strickland v. Washington*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death

7

sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984)

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686.  Judicial scrutiny of counsel's actions is highly deferential.  *Strickland*, 466 U.S. at 689.  The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and it is the defendant's burden to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  *Id.* (citation and quotation marks omitted). The *Strickland* test "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 790 (2011). The court must therefore "affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as they did." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1407 (2011) (citation and quotation marks omitted).

The petitioner also bears the burden to affirmatively prove prejudice. *Strickland*, 466 U.S. at 693.  In order to show prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

When a state court has rejected a *Strickland* claim on the merits, as is the case here, federal habeas review is even more circumscribed.  "The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 131 S. Ct. at 788 (internal citations and quotation marks omitted).  "When §2254(d) applies, the question

is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*  The state court's determination that a petitioner's ineffective assistance of counsel claim lacks merit "precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Id.* at 786 (internal quotation marks and citation omitted).  However, "[w]hen a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court.  The unadjudicated prong is reviewed de novo."  *Rayner v. Mills*, 685 F.3d 631,  638 (6th Cir. 2012).

> 1.  Federal DEA report produced on third day of trial

Petitioner asserts that his counsel was ineffective in failing to use or investigate a confidential DEA report that was disclosed to counsel on the third day of trial.  Petitioner argues that the DEA report directly contradicts the prosecution's case-in-chief by offering an alternate theory of the case, shedding doubt on the credibility of the prosecution witnesses, and explaining the actions of the witnesses.  He asserts that the report contains statements of an unidentified confidential informant to a federal officer that Jamale Stewart accepted a contract to kill one of the victims, Chris Kasshamoun, and that Jamale executed the contract by hiring a contract killer, Rudy, who arrived from New York.  The report suggested Rudy was Jamale's cousin or brother.  The report also identifies witnesses Tuwana Chambers, Aaron Arrington, and Gerald Collins as part of Jamale's drug dealing operation.  The report was prepared by a federal agent in the Detroit field office.

The Michigan Court of Appeals directed an evidentiary hearing on the issue of whether trial counsel's handling of the federal DEA report was ineffective.  The trial court held the evidentiary hearing over the course of four days, commencing it on September 27, 20006 and completing it on February 12, 2007.  After completion of the evidentiary hearing, and following review of the sealed

DEA report, the sealed transcript of the evidentiary hearing, and sealed supplemental briefs, the

Court of Appeals rejected Petitioner's ineffective assistance of counsel claim arising from the report:

> Defendant claims that defense trial counsel failed to use information in a federal report to impeach witnesses and to provide an alternate theory of the crime. In regard to the disclosure of the federal report, the following occurred at trial:

> Prosecutor. The discovery that was in question earlier during this trial has been reviewed by the Court, as well as sister Counsel. And for further review, there is not only a determination that she has the discovery, but will not be using that discovery. There has been an agreement, also, Josephine Kasshamoun, [wife of Kasshamoun], who has been endorsed by the People as a witness, I believe is being waived at this time. I will not be calling her.

> Trial Court. Okay?

> Defense Counsel. That is correct.

> Defense trial counsel later claimed at the Ginther hearing that her affirmation was an acknowledgment of the trial court's ruling rather than a waiver.  She also indicated at the *Ginther* hearing that she entered into the agreement because the trial court would not allow her to use the federal report or question Josephine Kasshamoun in regard to the federal report. However, despite defense trial counsel's subsequent explanation of her statement, the record plainly indicates that she intentionally agreed to relinquish any right in regard to the federal report and the testimony of Josephine Kasshamoun. The intentional relinquishment of a known right constitutes a waiver, which extinguishes the error. *People v. Carter*, 462 Mich. 206, 215-216, 612 N.W.2d 144 (2000)*; People v. Dobek*, 274 Mich. App. 58, 65, 732 N.W.2d 546 (2007).

> Alternatively, defendant maintains that defense trial counsel was ineffective for waiving the use of the federal report or the testimony of Josephine Kasshamoun. Even assuming defense trial counsel was allowed complete access to the federal report and the testimony of Josephine Kasshamoun, we conclude that not presenting this evidence to the jury would constitute reasonable trial strategy. Although at the *Ginther* hearing defense trial counsel maintained that she would have been effective in impeaching witnesses with the federal report and the testimony of Josephine Kasshamoun, defense trial counsel failed to mention that the federal report, and ostensibly Josephine Kasshamoun's testimony, also contains arguably prejudicial and inculpatory evidence. The federal report indicates a person from New York named Rudy, who was related to Jamal, came to Detroit to kill the victim after Jamal accepted a contract on the victim's life.

> Regardless of defense trial counsel's intent, not admitting the federal report or the testimony of Josephine Kasshamoun constituted reasonable trial strategy. While defense trial counsel would have gained a minor advantage in possibly being able to impeach witnesses with the report, testimony that a hit man from New York committed the offenses is particularly prejudicial to defendant. The information in the report is

especially prejudicial when considering evidence presented that defendant arrived from New York three days before the murders, that Jamale picked up defendant and rented him a room, and the manner of the offenses. Defendant claims in this regard that there is no evidence that defendant is Rudy. However, there is no dispute that defendant is from New York and has numerous nicknames, including Jason, Friday the 13th and New York.[1] Further, defendant cedes that in questioning witnesses about the federal report, that "the witnesses would likely have denied some of these facts and allegations." Thus, we cannot conclude defense counsel's waiver or failure to present the federal report or the testimony of Josephine Kasshamoun amounted to error so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment.

*O'Neal,* 2008 WL 3851219 at *4-5.

The decision of the Court of Appeals held that Petitioner failed to establish the first *Strickland* prong, deficiency, and did not reach the question of whether he established prejudice. Therefore, under Sixth Circuit precedent, this Court grants AEDPA deference to the question whether counsel was deficient and reviews the question of prejudice de novo. *Rayner*, 685 F.3d at 638.

Petitioner first challenges the Michigan court's holding that trial counsel waived use of the DEA report, stating that such a conclusion is unreasonable because trial counsel testified during the evidentiary hearing that her comments were merely an acknowledgment that the trial court told her she could not use the report. The Michigan court found that, despite counsel's testimony to the contrary, the trial record " record plainly indicates that she intentionally agreed to relinquish any right in regard to the federal report and the testimony of Josephine Kasshamoun." *O'Neal*, 2008 WL 3851219 at *5. This factual finding is presumed correct on habeas review unless Petitioner rebuts it by clear and convincing evidence. 28 U.S.C. §2254(e). Petitioner has failed to do so. The Michigan court was not obliged to accept trial counsel's testimony at the evidentiary hearing, and the record provides some support for the Court of Appeal's interpretation of counsel's remarks.

---

[1]Petitioner notes, correctly, that the Court of Appeals was incorrect in stating that Petitioner's nicknames included "New York." Aaron Arrington testified that Petitioner's nicknames included "Jason," and "Friday the 13th," but not "New York." T3, 102-03.

Thus, this Court must accept as true the Court of Appeals finding that trial counsel waived use of the DEA report and Kasshamoun's testimony.

Petitioner asserts, in the alternative, that the waiving use of the DEA report and Kasshamoun's testimony was ineffective. He argues that an effective counsel could have used the report to establish an alternative theory of the case, that Jamale killed the victims in the execution of a contract that he had accepted on Kasshamoun's life, and to establish that Chambers, Arrington and Collins dealt drugs for Jamale, which would establish a motive for them to lie on his behalf. Finally, Petitioner asserts that the report contains a threat by Jamale that "I'm about to kill all you motherfuckers," which was overheard on cell phone by the informant and would be admissible as a present sense impression or excited utterance.

These arguments were presented to and rejected by the Michigan Court of Appeals. Upon review of the entire record, this Court cannot say that the Michigan Court of Appeals unreasonably applied *Strickland* in finding that Petitioner's counsel was not deficient in failing to utilize the federal report as Petitioner asserts it should have been used. A habeas court, in reviewing a state court's denial of a *Strickland* claim, may not grant the writ if there "is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S. Ct. at 788. Reasonable jurists could accept the argument that a reasonable attorney would choose not to use the federal report because facts in the report suggest that Jamale did not personally kill the victims, that a hired hit man from New York that was related to Jamale killed the victims, and the record reflects that Petitioner recently came from New York, was picked up by Jamale, and was the father of Jamale's youngest brother.

Petitioner argues that there is no record evidence that Petitioner is Rudy, and several witnesses familiar with Petitioner stated to investigators that Rudy is unknown to them or suggested in interviews that Rudy and Petitioner are different people. Petitioner also argues that trial counsel

testified in the *Ginther* hearing that she did not believe that Petitioner was Rudy and had no strategic reason for not using the federal report. However, *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 131 S. Ct. at 790. So the question is whether reasonable jurists could dispute whether a competent attorney would chose to waive use of the report on the facts in the record. The Court concludes that reasonable jurists could debate whether this constituted sound strategy.

Petitioner also argues that trial counsel was deficient in failing to use the report as the basis for a motion to disclose the confidential informant and call that person as a witness. Petitioner further argues that, once identified, the informant could directly testify as to the Jamale's claimed statement "I'm about to kill all you motherfuckers" and could testify to the involvement of the other witnesses with Jamale's drug dealing operation. Petitioner does not assert that the report itself would be admissible, and the Michigan Court of Appeals ruled that the trial court would be within its discretion to exclude the report as hearsay and because its probative value is outweighed by its potential for unfair prejudice. *See O'Neal*, 2008 WL 3851219 at *11. As the report itself was excludable, counsel could only be ineffective for failing to use it as a basis for cross-examination or to spur additional investigation.

On the question of what further use trial counsel should have made with the confidential report, aside from its use to cross-examine the prosecution's witnesses, the Court finds it easier to address the question of prejudice rather than the question of whether trial counsel's conduct was deficient. *See Strickland*, 466 U.S. at 698 (court need not address issue of performance if claim can be disposed of on grounds of lack of prejudice). The Michigan court did not reach the issue of prejudice with regard to Petitioner's first claim of ineffective assistance of counsel, so this Court therefore reviews the question *de novo*. *Rayner*, 685 F.3d at 638.

Reviewing the issue *de novo*, based on the entire record, the Court finds that Petitioner has failed to establish that counsel's failure to pursue additional information with regard to the confidential report prejudiced the defense.  The Petitioner has the burden of affirmatively showing prejudice.  *See Strickland*, 466 U.S. at 693.  Here, the trial court held an evidentiary hearing more than two years after the trial.  Yet, at that evidentiary hearing, Petitioner did not produce any evidence that further investigation would have uncovered.  Petitioner did not produce affidavits or testimony supporting any of the statements in the confidential report.  Instead, Petitioner still asks the Court to speculate as to what evidence might have been uncovered if trial counsel had sought the opportunity to further investigate the allegations in the report.  Given Petitioner's failure to come forward with any additional evidence at the evidentiary hearing, the Court finds that Petitioner has not shown a reasonable probability that additional investigation would have resulted in an acquittal, even assuming that an effective counsel would have taken steps to further investigate. *See Clark v. Waller,* 490 F.3d 551, 557 (6th Cir. 2007) (where petitioner offers no evidence as to what potential witness would have testified, he fails to show that he was prejudiced by the failure to call the witness); *Walker v. Harry*, 462 F. App'x  543, 546 (6th Cir. 2012) (where petitioner failed to call witnesses to testify at *Ginther* hearing, petitioner cannot rely on hearsay to establish prejudice based on their failure to testify at trial).

Petitioner has not established ineffective assistance of counsel with regard to the federal report.

### 2.   Failure to request and use letters from Jamale and Felicia to Ramone

Petitioner's second claim of ineffective assistance of counsel asserts that his counsel was deficient and prejudiced his defense by failing to request and use letters written by Jamale and Felicia to Ramone while Ramone was incarcerated.  Petitioner asserts that the letters should have

been used to establish that Jamale, Ramone and Felicia were communicating in an effort to coordinate their stories and frame Petitioner for the murders.

This claim of ineffective assistance of counsel was also considered and rejected by the Michigan Court of Appeals:

> Defendant argues that defense trial counsel was ineffective in failing to use letters by Jamale and Felicia to Ramone, who was in jail, to impeach Jamale and Felicia. Defendant claims that Ramone's August 12, 2003 deposition testimony indicates that Ramone, while in jail, received letters from Jamale and Felicia.
>
> Specifically, defendant claims that letters "can be read to telegraph to Ramone that they are framing [defendant] for the murder[s]." In support, defendant cites a letter from Jamale to Ramone in which he writes, "I did not plan to rob anybody. Jason did[,] not me[,] that might be one the things they ask you." We conclude that the language of the statement does not support defendant's claim of collusion. The statement merely indicates how Jamale would testify at trial, and does not encourage Ramone to lie. Indeed, defendants admits, "there could arguably be other interpretations for [the letters' content.]"
>
> Defendant cites another letter from Jamale to Ramone in which defendant claims Jamale provided instruction to name defendant as the shooter and explain an inconsistent statement:
>
>> 3) I was scared of [Dujuan], knowing he killed and cut people up.
>>
>> 4) I had been drinking when I gave my statement.
>>
>> 5) On the night it all went down I went over to the house. Jamale was looking so scared so I asked he what was wrong he said nothing come back later I said no tell me what's wrong. I walked pass him and sat down then Jason came by the door area and came here so I went with him downstairs I saw three bodies on the floor so a ran back upstairs....
>
> Again, the above statement is largely consistent with Jamale's testimony at trial and could just as easily be read to explain Jamale's understanding of events rather than Jamale providing instruction to Ramone. Defense trial counsel did not commit a significant error in failing to impeach Jamale with this statement.
>
> Defendant also cites a letter in which Jamale wrote to Ramone: "my lawyer is having a meeting with Big Boy and her to fix what they said." Further, that: "Big Boy and little mama fixing there hook up so with that and both of us on the same page and not against each other we will go home real soon plus I know you didn't do anything and you know I didn't plan to rob or harm anyone." Defendant claims the above statement "could be interpreted to explain to Ramone that all the witnesses were changing their original statements to implicate [defendant] and minimize the involvement of [Jamale] and

15

[Ramone].” Again, defendant's interpretation of the above statement to support a claim of collusion is without support. The statement does not suggest how Ramone should testify and may only indicate that two people had prior inconsistent statements, which Jamale's lawyer attempted to render consistent.

Defendant last claims that the letters urge Ramone to corroborate Jamale's description of events. In support, defendant cites a letter from Jamale to Ramone that stated: “Ray don't make no deal to jam me we are the same blood if you do I will get life do you want to get your little brother life for something I didn't do.” Defendant also cites, in this regard, Felicia's letter to Ramone in which she wrote that, “y'all can't fall apart that's what they are banking on you got to stick together don't be the weak link.” Here, Jamale's letter to Ramone could merely indicate that Jamale wanted Ramone to be truthful. Further, Felicia's letter to Ramone is vague at best, and need not be construed as evidence of a plot to fabricate testimony.

Further, even assuming that defense counsel improperly failed to impeach witnesses with the above statements, defendant has not shown the existence of a reasonable probability that, but for this error, the result of the proceeding would have been different. Essentially, this impeachment evidence is cumulative to other evidence presented and argued at trial that tended to show that Jamale was not credible. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Here, any additional impeachment of witnesses with the above statement would be marginal evidence of collusion, and thus, defendant has not established ineffective assistance of counsel.

*O'Neal,* 2008 WL 3851219 at *6-7.

The Michigan Court of Appeals decision found both that trial counsel's failure to use the letters to impeach the witnesses was not deficient and that it did not prejudice the defense; therefore, this Court accords deference to both *Strickland* prongs. Applying two levels of deference to the question, the Court finds that Petitioner has failed to establish that the Michigan court applied the *Strickland* test unreasonably. The statements in the letters are not wholly positive for Petitioner. As the Michigan court points out, the letters are, in fact, consistent with Jamale's testimony at trial. Therefore, they could be used by the prosecution to bolster the argument that Jamale had a consistent story, even in personal letters to his brother that he did not know would be produced. Furthermore, Jamale repeatedly asserts his innocence in the letters. Reasonable jurists could find that a reasonable attorney could have decided that using the letters to impeach Jamale carried more danger than benefit.

16

As for the prejudice prong, applying the two levels of deference appropriate to this Court's review, reasonable jurists could dispute whether there was a reasonable probability that the result of the trial would have been different if Jamale and Felicia had been impeached by the letters. The stories in the letters are consistent with their testimony at trial. Furthermore, trial counsel had already impeached Jamale and Felicia with their motivation to lie based on their relationship. Reasonable jurists could debate the Michigan Court of Appeals' holding that there was not a reasonable probability that the result of the trial would have been different if Jamale and Felicia had been impeached by their letters to Ramone.

    3.  Failure to call Alibi witness Keith Hale

Petitioner argues that trial counsel was ineffective because she failed to call Keith Hale as an alibi witness.

Petitioner filed a notice of alibi prior to trial identifying his brother Craig O'Neal and Marcus O'Neal as alibi witnesses, who would testify that Petitioner was at the home of Marcus O'Neal in the early afternoon and later at the home of a mutual friend on November 19, 2002, the date of the murders. At trial, however, defense counsel stated on the record that, although the defense listed Craig and Marcus as alibi witnesses, the defense intentionally did not call them. Tr. 6/10/02 at 3.

Petitioner raised the issue of additional alibi witness Keith Hale at the *Ginther* hearing. Hale testified at the hearing that he spent the evening of November 19, 2002 from 7:00 or 7:30 until about midnight with Petitioner and a number of other people at the home of a person named June. Hale testified that Craig O'Neal had set up an appointment for Hale to meet with defense counsel before Petitioner's trial, but they missed that appointment and trial counsel never set up another appointment or otherwise contacted Hale.

Petitioner also questioned trial counsel at the hearing about her failure to call Hale as a witness at trial. Trial counsel identified a draft notice of alibi that she had prepared prior to trial that listed

17

Keith Hale and Lawrence Hunter, in addition to Craig and Marcus O'Neal.  However, the notice of alibi as filed listed only Craig and Marcus O'Neal.   Trial counsel testified that she could not recall why her final notice of alibi only included Craig and Marcus O'Neal but did not include Hale or Hunter.  Counsel testified that she was aware of Hale and his potential alibi testimony but never interviewed him and never made a strategic decision to not present his testimony.

The Michigan Court of Appeals rejected this claim of ineffective assistance of counsel in Petitioner's direct appeal:

> Defendant argues that defense trial counsel was ineffective for failing to present Hale's testimony. Hale testified at the *Ginther* hearing that on November 19, 2002 he was at his brother's birthday party and saw defendant arrive at around 7:30 p.m. However, when asked if he had "any doubt in his mind that you were with [defendant] on November 19, 2002 after 6 or 7 p.m. when it got dark," Hale replied, "Not unless he was very fast. I think he was there unless he may have went to the store or I went to the store." Further, when asked "when did [defendant] leave," he replied, "They stayed there most of the time I was there. I don't know who left first. I think they may have left first, but it was late."
>
> Defendant has failed to show that had Hale testified at trial the result of the proceedings would have been different. Even in a light most favorable to defendant, Hale's testimony does not secure defendant's alibi. At most, Hale's testimony indicates only that he saw defendant sometime in the evening of November 19, 2002.

*O'Neal*, 2008 WL 3851219 at *7.

Because the Court of Appeals rejected Petitioner's ineffective assistance of counsel claim on the second *Strickland* factor, prejudice, and did not address whether the failure to call Hale constituted deficient performance, this Court accords AEDPA deference to the question of prejudice and reviews the performance prong *de novo*.

The Michigan court did not unreasonably apply *Strickland* in finding that Petitioner failed to establish that he was prejudiced by his trial counsel's failure to call Hale to the stand.  As the Michigan Court of Appeals noted, Hale's testimony would only provide an alibi for some of the time after the murders, and would only go to partially impeach Felicia's and Jamale's testimony that

18

Petitioner showed up at the hotel in the evening, and even on this point Hale was not completely positive Petitioner was with him for the entire period from 7:30 p.m. to midnight.

Petitioner also fails to establish that his trial counsel was deficient in failing to present Hale's alibi testimony. Not presenting Hale's testimony could be a reasonable strategy, because calling Hale but not Marcus and Craig O'Neal could raise the question in the jury's mind as to why Petitioner failed to call Marcus and Craig, who were claimed alibi witnesses to Petitioner's movements during the actual period of the murders. In light of this, a reasonable counsel could have chosen not to present Hale's alibi testimony and instead focus on impeaching Jamale's testimony.

### 4. Failure to investigate and use ballistic evidence

Petitioner's fourth claim of ineffective assistance focuses on his trial counsel's failure to obtain and present evidence to the jury regarding a used bullet shell that was found in Jamale's home. As noted above, Jamale borrowed a Ford Explorer earlier in the day from a car dealership. Jamale abandoned the Explorer when police officers attempted to pull him over as he was driving it after the murders. Inside the Explorer was a firearm, bloody clothing, and the victims' property and identifications. Ballistic evidence presented at trial by the prosecution showed that bullet fragments recovered from the victims' bodies matched each other but did not match the gun found in the Explorer. However, at the *Ginther* hearing, appellate counsel presented evidence that a shell found by the police in Jamale's house after the fire did match the firearm found in the Explorer. Petitioner argues that trial counsel was ineffective for failing to develop this ballistic evidence and present it to the jury because it would have undercut the prosecution's claim that Jamale was not involved in the shooting because the bullets analyzed did not match the gun in the Explorer.

The Michigan Court of Appeals rejected this claim of ineffective assistance of counsel:

> Defendant argues that defense trial counsel was ineffective in failing to present evidence that a shell found at defendant's house matched the gun found in the Explorer. Ballistics

evidence at trial showed that bullet fragments from the victims' bodies were fired from the same weapon, but not the weapon in the Explorer. Defendant claims the omitted evidence would have contradicted the prosecution's theory that Jamale "could not have been involved in the shooting because the bullets did not match his gun." Defendant has failed to show ineffective assistance of counsel in this regard. Even if defense trial counsel presented this evidence, the prosecution could nonetheless maintain that the bullets found in the victims' bodies were not from the gun found in the Explorer. Thus, defendant has failed to show how introduction of this evidence would have changed the result at trial.

*O'Neal,* 2008 WL 3851219 at *7.

The Michigan court rejected this ineffectiveness claim on prejudice and did not reach performance, so this Court accords AEDPA deference only to the second *Strickland* prong. The Michigan court did not unreasonably apply *Strickland* in finding that Petitioner was not prejudiced by counsel's failure to present this ballistic evidence. The gun found in the Explorer was Jamale's, and the house where the bullet shell was recovered was also Jamale's. The fact that a bullet shell matching the gun found in the Explorer was also found in Jamale's house is easily explained by the fact that both the gun and the house belonged to Jamale. It is not reasonably probable that the result of the trial would be different if trial counsel presented evidence matching a shell found in the house to the gun found in the Explorer.

Petitioner also fails to establish that his counsel was deficient in failing to present this ballistic evidence to the jury. The fact that a shell casing found in Jamale's house matched the gun found in the Explorer does not substantially undermine Jamale's version of events or support Petitioner's. Counsel's failure to present this evidence to the jury is not an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

  5.  Failure to properly impeach Home Depot clerk's testimony

Petitioner's fifth ineffectiveness claim asserts that his trial counsel was ineffective because she failed to properly impeach Latoya Bell, the Home Depot clerk who sold the Shop-Vac and chain saw.

Shortly after the murders were discovered, Police Officer Joann Miller showed Bell a picture of a man and asked whether she could identify him. Bell told Miller that the man in the picture "looked familiar." Bell's statement, as taken by Miller, described the man purchasing the chainsaw and Shop-Vac as between 27 and 28 years old, with shoulder length braids and a scar on his neck. Jamale had braids around the time of the murders, but there is no evidence that Petitioner did.

Bell testified at Petitioner's trial. Bell, however, was unable to remember anything about the person who purchased the items, nor did she recall making any statement to police or anything about the photograph shown to her. Bell testified that her signature was at the bottom of the statement taken by Officer Miller, and Bell did not deny making the statement, but she had no present recollection of making the statement or the facts contained in the statement. Trial counsel read Bell's statement into the record.

At the *Ginther* hearing, Petitioner called Officer Miller to testify. Officer Miller testified that she interviewed Bell and showed her a photograph, which Bell said looked familiar. Miller was unable to recall whose photograph was shown to Bell.

Petitioner asserts that trial counsel was ineffective for failing to recall Officer Miller to the stand to impeach bell after Bell testified that she did not recall making the statement. The Michigan Court of Appeals rejected this claim of ineffective assistance of counsel.

> Defendant argues that defense trial counsel was ineffective in failing to call Police Officer Joann Miller to impeach Bell, the Home Depot cashier. Bell testified that she could not remember signing a statement in which she identified a black male between 27 and 28, shoulder length braids and a scar on his neck, as a Home Depot customer around the time of the offense. The described person apparently better described Jamale than defendant. However, defense trial counsel read the statement to Bell, and although Bell still could not remember making the statement, she acknowledged her signature. Contrary to defendant's argument, defense trial counsel adequately impeached Bell with

21

her own signed statement. Thus, defendant has failed to show how further impeachment of Bell would have resulted in a different result at trial.

*O'Neal*, 2008 WL 3851219 at *7.

The Michigan court reasonably applied *Strickland* in rejecting this claim of ineffective assistance of trial counsel. As the Michigan court noted, trial counsel succeeded in getting Bell to acknowledge her signature on the statement and in having the substance of Bell's statement read into the record. Neither Bell nor Miller could identify the person in the photograph or provide further information. It was not deficient performance to fail to call Miller to the stand and it is not reasonably probable that the result of the trial would have been different if trial counsel had recalled Miller to the stand to testify that Bell had made the statement.

6. Failure to impeach Felicia's testimony with prior statement

Petitioner asserts that trial counsel was ineffective because she failed to use a prior inconsistent statement to impeach Felicia's trial testimony. At trial, Felicia testified that she saw Petitioner at a hotel after the murders. Felicia asked Petitioner "why" and he responded that he "couldn't let the money get away. It was about money, but his intentions really wasn't to kill those people, but it was too much money." Tr. III, 41. Felicia gave a statement to police in West Virginia a week after the murders that does not mention that she was in a hotel with Petitioner the day of the murders or Petitioner's confession. Petitioner argues that trial counsel should have used this statement to impeach Felicia's testimony that the meeting at the hotel took place.

The Michigan Court of Appeals rejected this claim on the merits:

Defendant also argues that defense trial counsel failed to impeach Felicia's testimony that defendant admitted to the murders at the hotel, with a prior opposing statement. In the prior statement, she did not mention speaking to defendant or going to the hotel. However, Felicia's failure to indicate that defendant admitted to the murders at the hotel could simply mean that she wasn't asked that question. Defendant has not sustained the heavy burden of proving ineffective assistance of counsel in this regard.

*O'Neal,* 2008 WL 3851219 at *8.

This holding reasonably applies *Strickland* and is supported by the record. The police report that records Felicia's statement shortly after the crimes includes both the questions asked of her and her responses.  While Felicia was asked about her whereabouts the morning of the fire at Jamale's and about the last time she spoke to Jamale, the police report does not reflect that she was asked about the evening prior to the fire or any conversation with Petitioner.

7.   Eliciting "Friday the 13th" nickname.

Petitioner asserts that his trial counsel was ineffective and prejudiced his defense by asking a question of witness Aaron Arrington that elicited  that one of Petitioner's nicknames was "Friday the 13th."  Arrington had given the police a statement, in which he identifies Petitioner as "Jason," and states that Jamale and Ramone sometimes called him "Friday the 13th."  During cross examination, trial counsel asked Arrington about nicknames he associated with Petitioner, and he stated that he heard him called "Jason" and "Friday the 13th."  The prosecutor brought up the "Friday the 13th" nickname several times during closing arguments, including a portion discussing the chainsaw dismemberment of one of the victims.  Petitioner argues that, given trial counsel was in possession of information that Arrington had heard Petitioner referred to as "Friday the 13th," trial counsel was constitutionally ineffective for asking Arrington for any nicknames for Petitioner.

The Michigan Court of Appeals rejected this claim on the merits:

> Defendant argues that defense trial counsel was ineffective in eliciting defendant's nickname, Friday the 13th, at trial. Presumably, defendant's nickname is adverse given that the victims in this case were mutilated in a manner consistent with mutilations depicted in the Friday the 13th horror movie franchise. Here, there is no evidence that defense trial counsel knew the witness would attest to defendant's nickname, "Friday the 13th," rather than another nickname, "Jason." Defendant has not shown ineffective assistance in this regard.

*O'Neal,* 2008 WL 3851219 at *8.

This decision does not unreasonably apply *Strickland*.  Trial counsel had a legitimate reason to ask Arrington about Petitioner's nicknames. Arrington testified at trial that Petitioner was present

23

at Jamale's house on the day of the murder.  However, in an investigative deposition, Arrington testified that Petitioner was not present when Arrington arrived at Jamale's house on the date of the murder.  Establishing what nicknames Arrington knew Petitioner by was important because Arrington referred to the people present by nicknames - he stated in the deposition that he didn't see "Jason" or "New York" in the living room when he entered with "Blue." Tr. III, 103-04.  Trial counsel impeached Arrington's testimony at trial that Petitioner was present in Jamale's house with his prior investigative deposition testimony that Petitioner was not present.  There is no evidence that Arrington referred to Petitioner as "Friday the 13th" during the investigative deposition; instead, the only evidence that Arrington knew Petitioner as "Friday the 13th" was in a witness statement in which Arrington told police that Jamale and "Roachie" sometimes called Petitioner "Friday the 13th."  Trial counsel made an error by failing to recall that Arrington had stated that Jamale and Roachie sometimes called Petitioner "Friday the 13th."  Every error made by an attorney does not, however, constitute ineffective assistance of counsel.  *Cf. Harrington*, 131 S. Ct. at 791 (attorney error not ineffective unless so fundamental as to call the fairness of the trial into doubt).  To show deficient performance, a petitioner must establish that his trial counsel "was so deficient that he was not performing his basic function under the Sixth Amendment." *Jones v. Bagley*, 696 F.3d 475, 489 (6th Cir. 2012).  Here, the Michigan Court of Appeals reasonably concluded that trial counsel's poorly worded question did not amount to constitutionally deficient performance.

>    8.   Cumulative error

Petitioner argues that even if any single error made by his counsel did not constitute ineffecitve assistance, their cumulative effect was to deny him a fair trial.  As discussed above, however, applying the appropriate level of deference to counsel's actions and to the Michigan court's prior holding, Petitioner has failed to establish that any one of his counsel's actions were deficient and prejudiced his defense.  Therefore, his cumulative error claims also fails.

B. *Brady* Claim

Petitioner's second habeas claim asserts that the prosecution violated his due process rights by failing to produce the federal DEA report and the letters to Ramone from Jamale and Felicia.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence in material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty of the prosecution to produce exculpatory material extends to impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The prosecutor is responsible to learn of, and produce, any material exculpatory evidence "known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene,* 527 U.S. at 281-282 (1999).

1. The federal DEA report

The Michigan Court of Appeals addressed the question of whether the late production of the federal DEA report by the prosecution on the third day of trial violated the prosecutor's obligations under *Brady*:

> We initially conclude that defense counsel waived any *Brady* violation in regard to the federal report. As mentioned, supra, section II-A, defense trial counsel expressly agreed that "she has the discovery [the federal report], but will not be using that discovery."

The intentional relinquishment of a known right constitutes a waiver, which extinguishes the error. *Carter, supra* at 215-216, 612 N.W.2d 144; *Dobek, supra* at 65, 732 N.W.2d 546. Here, defense counsel clearly agreed not to use the evidence now claimed to be the subject of a *Brady* violation. Thus, any *Brady* error is extinguished.

*O'Neal*, 2008 WL 3851219 at *8.

> a.  Procedural default

Respondent argues that Petitioner's *Brady* claim with regard to the federal DEA report is procedurally defaulted because the Michigan Court of Appeals held that Petitioner's trial counsel had waived the *Brady* violation on the record.   Petitioner asserts that any such waiver would constitute ineffective assistance of counsel that would excuse the procedural default.

When the state courts rely on a valid state procedural bar in refusing to review alleged constitutional errors, federal habeas review is barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Attorney error can constitute cause to excuse a procedural default if the error rises to the level of constitutionally ineffective assistance of counsel under the standards set forth by the United States Supreme Court in *Strickland*.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). In an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).  Such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

While the procedural default doctrine precludes habeas relief on a defaulted claim, it is not jurisdictional. *Trest v. Cain*, 522 U.S. 87, 89 (1997). Judicial economy sometimes counsels reaching the merits of a claim or claims if the merits are "easily resolvable against the habeas petitioner,

whereas the procedural-bar issues involve complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). Determining whether Petitioner's attorney was constitutionally ineffective for failing to preserve Petitioner's *Brady* claim requires the Court to reach the merits of Petitioner's *Brady* claim, because in order to show that counsel was ineffective for failing to raise a claim, Petitioner must show a reasonable probability that the claim would have succeeded if it had been raised by counsel. In such a case, the cause and prejudice analysis merges with an analysis of the merits of Petitioner's habeas claim, and it is easier simply to consider the merits of Petitioner's habeas claim. *See Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009) (*Lambrix* permits courts to skip procedural default issues and reject claims on the merits where the merits present more straightforward grounds for decision). The Court will therefore proceed to consider the merits of Petitioner's *Brady* claim with regard to the federal DEA report.

     b.   *Brady* violation with regard to federal DEA report

The Michigan court found, in the alternative, that Petitioner failed to establish that the late production of the federal DEA report prejudiced him:

> This Court outlined four factors a defendant must prove to show that the prosecutor violated defendant's due process rights under *Brady* in *People v. Fox* (After Remand), 232 Mich.App. 541, 549, 591 N.W.2d 384 (1998), including:
>
> > (1) that the state possessed evidence favorable to the defendant, (2) that the defendant did not possess the evidence and could not have obtained it with the exercise of reasonable diligence, (3) that the prosecution suppressed the favorable evidence, and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.
>
> In *People v. Lester*, 232 Mich.App. 262, 282-283, 591 N.W.2d 267 (1998), this Court explained that:
>
> > The failure to disclose impeachment evidence does not require automatic reversal, even where, as in the present situation, the prosecution's case depends largely on the credibility of a particular witness. The court still must find the evidence material. Undisclosed evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is "a

27

probability sufficient to undermine confidence in the outcome." Accordingly, undisclosed evidence will be deemed material only if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." In determining the materiality of undisclosed information, a reviewing court may consider any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.

In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant to the crime or where the likely effect on the witness' credibility would have undermined a critical element of the prosecutor's case. In contrast, a new trial is generally not required where the testimony of the witness is corroborated by other testimony or where the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable. [Citations omitted.]

Even assuming that defense trial counsel did not waive this claim, defendant has not established error requiring reversal. First, defendant only sought to use the federal report to impeach witnesses. However, at trial, defense trial counsel primarily impeached Jamale and suggested Jamale committed the offenses. Thus, evidence of the federal report would merely furnish an additional basis on which to impeach Jamale, whose credibility has already been shown to be questionable.

*O'Neal*, 2008 WL 3851219 at *8-9.

This Court must defer to the Michigan court's holding unless the decision unreasonably applies clearly established law as set forth by the United States Supreme Court or is based upon unreasonable determination of the facts. Here, the Michigan court reasonably applied *Brady* in finding that Petitioner had failed to establish that he was prejudiced by the late production of the federal DEA report. As discussed above, the report itself was inadmissible. Petitioner failed during the evidentiary hearing to establish that earlier production of the report would have led to admissible evidence. *See Supra* Section A.1. Therefore, as stated by the Michigan court, the only use for the report would have been to attempt to further impeach Jamale by asking him whether he had the victims killed for money, and asking other witnesses whether they sold drugs on behalf of Jamale. It is not reasonably likely that such a line of impeachment would have changed the result of the trial.

The Michigan court therefore did not unreasonably find that the report was not material and therefore the Court of Appeals did not unreasonably apply *Brady*.

　　2.　The non-production of the letters from Jamale and Felicia to Ramone

Petitioner's second *Brady* claim asserts that his due process rights were violated because the prosecution failed to produce letters written by Jamale and Felicia to Ramone while Ramone was in jail.  Petitioner asserts that the letters, discussed above in relation to Petitioner's ineffective assistance of counsel claims, are an attempt by Jamale and Felicia to mold any testimony Ramone might give with regard to the murders, and are an oblique attempt to frame Petitioner for the murders.

> The Michigan Court of Appeals rejected this claim on the merits:
>
> In regard to the letters from Jamale and Felicia to Ramone, there is no reasonable probability that the outcome of the proceedings would have been different had the letters been disclosed to the defense. As explained in section II, supra, defendant sought the letters to impeach Jamale's credibility at trial.
>
> Here, defendant cedes that the letters are subject to different interpretations. Further, given that defense trial counsel took every opportunity to challenge Jamale's credibility at trial, there is little adverse effect on the preparation or presentation of defendant's case. In addition, the suppressed impeachment evidence merely furnishes an additional basis on which to impeach Jamale, whose credibility has already been shown to be questionable. Therefore, reversal is not required in this regard.

*O'Neal*  2008 WL 3851219 at *9.

In *Strickler v. Green*, 527  U.S. 263 (1999), the United States Supreme Court addressed the issue of *Brady* materiality in a case where the prosecution suppressed potentially devastating impeachment evidence as to a significant witness in an abduction and murder of a young woman. The prosecution in that case introduced numerous pieces of circumstantial evidence showing that the petitioner, Strickler, had participated, along with two co-defendants, in the abduction and murder of a young college student.  This evidence included Caucasian hairs at the scene that were probably Strickler's, a witness seeing Strickler drive the victim's car afterwards, identification cards and

clothing belonging to the victim at Strickler's house, and overheard conversations implying Strickler had killed someone.  However, the only eyewitness testimony to Strickler's interaction with the victim came from a woman, Anne Stoltzfus.  Stoltzfus testified that she saw Strickler, his co-defendant Henderson, and a blonde girl inside a mall and later witnessed their abduction of the victim in the mall's parking lot.  She testified that she saw the man that she later identified as Strickler pound on the victim's car, yank the door open, jump in and repeatedly hit her on the head and shoulders and saw the victim mouth the word "help."  *Strickler*, 527 U.S. at 272-73.  After petitioner was convicted of capital murder, and sentenced to death, the defense discovered notes of interviews with Stoltzfus in the days after the discovery of the crime, in which Stoltzfus told detectives that she could not identify the victim or the male perpetrators.  The defense also discovered a letter written by Stoltzfus to a detective in which she stated she had not remembered being at the mall until her daughter jogged her memory, and was unsure about the identity of the person entering the car.  One undisclosed note describes the victim's car but makes no mention of the license plate number Stoltzfus testified to at trial.  Another undated note states that Stoltzfus did not go to the police immediately after the incident because "I totally wrote this off as a trivial episode of college kids carrying on."  *Strickler*, 527 U.S. at 275.   The prosecution relied on Stoltzfus' testimony to demonstrate petitioner's violent tendencies and his leadership in the abduction and, by inference, the murder.  *Strickler*, 527 U.S. at 290.

The Supreme Court held that petitioner had established the first two *Brady* factors, that the documents were favorable to the petitioner and were suppressed by the government.  *Strickler*, 527 U.S. at 289.  The Court found, however, that petitioner failed to establish prejudice.  The Court found that although impeaching the Stoltzfus testimony "might have changed the outcome of the trial," petitioner had failed to undermine the Court's confidence in the outcome. *Strickler*, 527 U.S. at 291.  Because the petitioner failed to establish a reasonable probability that production of the

30

letters would have changed the outcome of either the guilt phase or the penalty phase, the Court held they were not "material" for purposes of *Brady*.

Here, as in *Strickler*, the withheld documents were relevant to impeachment of an important witness. However, while the production of the jailhouse letters to Ramone were potentially useful additional support for Petitioner's impeachment of Jamale, and to a lesser extent Felicia, Petitioner fails to establish that the Michigan court unreasonably found that the letters were immaterial in the sense that it is reasonably probable that the result of the trial would have been different if the letters had been produced to defense counsel. The jury was aware of the potential bias of both Ramone and Felicia in favor of Jamale due to their family relationship, and aware of the defense theory that Jamale, Ramone and Felicia were complicit in fabricating a story to frame Petitioner and exculpate Jamale. The letters, while potentially useful to defense counsel to bolster this theory of fabrication, are also potentially problematic in that they are consistent with Jamale's testimony at trial and reiterate Jamale's insistence that he is innocent. The Michigan court did not unreasonably apply *Brady* in finding the letters were not material, and therefore the prosecution's failure to produce them did not violate Petitioner's due process rights.

## V.    CERTIFICATE OF APPEALABILITY

In order to obtain a certificate of appealability, a petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

The claims raised by Petitioner in the petition, while not successful, are serious claims. The Court concludes that reasonable jurists could debate whether the petition should have been resolved in a different manner. The Court therefore finds the Petitioner has made a substantial showing of the denial of a constitutional right and will grant a certificate of appealability as to both claims in the petition.

## VI.   CONCLUSION AND ORDER

WHEREFORE, the petition for writ of habeas corpus is DENIED WITH PREJUDICE.

The Court GRANTS as certificate of appealability for both claims for habeas relief.


s/Lawrence P. Zatkoff
HON. LAWRENCE P. ZATKOFF
United States District Court Judge

DATE:  September 23, 2013

32